**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**DEANGELO PALMER,**<br><br>**Defendant.** | **Case No. 1:26-cr-00037-RBW** |

**UNITED STATES' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE**

The United States of America, by and through its undersigned counsel, respectfully submits this Memorandum in Opposition to Defendant's Motion to Suppress Tangible Evidence. For reasons that follow, this Court should deny the Defendant's motion.

**PRELIMINARY STATEMENT**

On February 18, 2026, officers with the Metropolitan Police Department lawfully searched the Defendant's vehicle and found a loaded firearm, 2.5 pounds of suspected cocaine, 93 Ziplock baggies, a digital scale, and other drug paraphernalia.

Officers initially stopped the Defendant because he appeared to be operating a motor vehicle without a seatbelt. During the ensuing car stop, the Defendant admitted, on body worn camera, that he had improperly tucked the seat belt under his left arm. Over the course of four minutes and fifty-four seconds, officers diligently conducted their investigation – checking the Defendant's license and information. Towards the end of the traffic stop, officers learned that the Defendant was on probation for armed robbery. As a result, officers lawfully stepped the Defendant out of the vehicle for their own safety while they gave a final explanation for the stop. During this 40 second interaction at the back of the vehicle, MPD Sergeant Robert Kelly, while lawfully

positioned outside of the vehicle, observed in plain view, a small clear twist baggie with a white powdery rock substance that he immediately recognized, based on his training and experience, to be drug paraphernalia, and seized the item.

Having established a fair probability that there was contraband in the vehicle, officers justifiably searched the rest of the vehicle and containers therein under the automobile exception to the Fourth Amendment. During that search, officers located a loaded firearm with one round in the chamber and ten rounds in the magazine, a digital scale, 93 small Ziplock bags, 1,140 grams, or approximately 2.5 pounds, of suspected cocaine, and seven packages of naloxone in various parts of the vehicle.

Defendant now seeks to suppress the evidence recovered from the vehicle. However, because officers conducted the stop and subsequent search of the vehicle within the boundaries of the Fourth Amendment, Defendant's Motion to Suppress should be denied.

**Factual Background**

On Wednesday, February 18, 2026, Fifth District Crime Suppression Team (CST) Officers Othterson (front passenger), Onoja (driver), and Sholoye (rear left passenger) were dressed in full MPD uniform operating marked MPD cruiser 960 utilizing call sign "CST11," while working alongside federal law enforcement partners assigned to the Making DC Safe and Beautiful Task Force.

Officers were patrolling near 21st Street NE and turned on to the 2000 block of Gales Street NE. Officers looked across the gated area, toward the south alley of the 2000 block of Benning Road NE. In the alley, officers noticed a sedan parked with its lights on. As officers drove on Gale Street NE parallel to where the Defendant's vehicle was stopped in the alleyway near Claggett Place NE, the Defendant began to drive eastbound on Claggett Place NE. Officers turned around

and drove eastbound on Gales Street NE, and then turned north going through the alleyway between Gales St NE and Claggett Street NE. Officers saw the Defendant operating the motor vehicle without appearing to wear a seatbelt at the T-intersection of the alleyway and Claggett Place NE.



*Figure 1: Map depicting the location where officers observed Defendant operating vehicle without a seatbelt. Red line represents Defendant's direction of travel, the yellow line represents the officers' direction of travel. The red circle is the approximate location where the vehicles converged and the seatbelt violation was observed.*

The sedan continued to the 600 block of 21st Street NE, and drove southbound on 21st Street NE. Officers stopped the vehicle in the 400 block of 21st Street NE.

The officers' vehicle came to a stop at 22:15:00 hrs. (Body worn camera ("BWC"), Officer Sholoye). Officer Onoja approached the driver's door of the vehicle and spoke with the driver, Deangelo Palmer, the Defendant. Officer Onoja asked, "Why are you not wearing your seatbelt correctly, sir?" (BWC, Officer Sholoye, 22:15:28). In response, the Defendant raised his left arm to show the seatbelt looped under his left shoulder against his rib cage. (BWC, Officer Othterson, 22:15:29).



***Figure 2: Still of Defendant showing the seatbelt being improperly worn underneath the shoulder***

Officer Onoja then followed up, stating in substance, "No, you are not wearing it correctly. That's not how you wear a seatbelt. *(*BWC, Officer Sholoye at 22:15:30).

Approximately thirty seconds into the car stop, the Defendant gave Officer Onoja his driver's license (*id.* at 22:15:39), and then about twenty seconds later, his registration (BWC, Sergeant Kelly, at 22:15:57). Officer Onoja then started walking back to the police cruiser to run database checks approximately thirty seconds later at 22:16:10. (BWC, Officer Othterson, 22:16:10).

Over the next three minutes, officers remained by the vehicle and asked the Defendant if he had any weapons, drugs, or other contraband in the car while they conducted their investigation. Meanwhile, the Defendant called his father. During the call, the Defendant's father asked why the police had stopped him. The Defendant stated in substance, "They didn't say why. My seatbelt is

on, but I had my arm like this," as he gestured with his left arm going over the seatbelt. *(id.* at 22:17:50-22:18:02). The Defendant continued, "They said my seatbelt not worn properly. (*id.).*

Officer Onoja's WALES check of the Defendant's identifying information revealed a notice to "contact a federal agent." (BWC, Officer Thrift, 22:18:42-22:18:48). Officer Onoja expressed uncertainty as to what this notice meant. Officer Dylan Thrift walked over to assist in the check and advised that the notice meant that the Defendant was on probation or supervised release. *(id.* at 22:18:51). Officer Onoja and Thrift then began walking back to the vehicle at approximately 22:19:10 hours.

Officers who were still positioned by the vehicle asked the Defendant whether he was "on papers" for anything. (*id.*; BWC, Sergeant Kelly, 22:19:15-22:19:50). Initially, the Defendant did not answer. (*id.*) Sergeant Kelly asked the Defendant again, and the Defendant admitted to being locked up for armed robbery and was on probation. (*id.*).

As this interaction occurred, Officer Onoja had returned to the driver's side of the Defendant's vehicle and was adjacent to Sergeant Kelly.

Officer Onoja then asked the Defendant to step out of the vehicle, and he complied. (BWC, Police Officer Sholoye, 22:19:54-22:20:15). Officer Onoja then walked with the Defendant to the back of the vehicle. Officer Onoja informed the Defendant that his registration checked out, discussed the reason for the stop, and that there was a similar vehicle that was reported stolen that officers just had to confirm. (*id.* at 22:20:15-22:20:22).

While Officer Onoja was speaking with the Defendant, Sergeant Kelly used his flashlight to look down the profile of the driver's side door and saw, through a gap in the armrest on the door, a clear plastic twist baggie holding white powdery rock substance. (BWC, Sergeant Kelly, 22:20:30-22:20:40).



*Figure 3: Still of Sgt. Kelly's body worn camera showing the gap in the armrest through which Sgt. Kelly observed the clear plastic twist baggie*



*Figure 4: (LEFT) Body worn camera still from Officer Sholoye at 22:20:34 showing Sgt. Kelly looking down the profile of the driver's side door from outside of the vehicle; (RIGHT) Enlarged portion of the image showing Sergeant Kelly.*



**Figure 5:** *A still image from Sergeant Kelly's body camera showing him shining a flashlight through the open car window from the outside*

Based on his training and experience, Sergeant Kelly believed the white powdery substance inside the plastic baggie was crack cocaine, so he informed other officers to secure the Defendant, stating to other officers, "There might be narcotics," as he gestured with his flashlight down the profile of the door. Once the Defendant was secured, Sergeant Kelly opened the door, confirmed his observations, and retrieved the clear plastic twist baggie from the map pocket of the door.

Officers then searched the rest of the vehicle. Inside the vehicle, they located a Smith & Wesson SD40 handgun in the center console of the vehicle. The firearm had one round in the chamber and ten rounds in the magazine. Officers found other drugs and paraphernalia in the vehicle consisting of a large white plastic bag located in the rear seat containing approximately 1,140 grams of white powdery substance of suspected cocaine, seven packages of naloxone,

approximately 93 smaller plastic bags consistent with distribution packaging, a digital scale bearing white powder residue, and approximately $350 in U.S. currency recovered from the vehicle and the Defendant's person.

### LEGAL STANDARDS

Law enforcement may constitutionally stop a car and its occupants to investigate a traffic violation. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *Whren v. United States*, 517 U.S. 806, 809-10 (1996). Once lawfully stopped, an officer is authorized to take the time reasonably required to complete ordinary inquiries to the mission of the stop and attend to any potential safety concerns. *Rodriguez*, 575 U.S. at 348. "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop to ensure that vehicles on the road are operated safely and responsibly." *Id.* Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver and inspecting the automobile's registration and proof of insurance. *Id.; see also Prouse*, 440 U.S. at 658-60 (1979).

Generally, police may not prolong a traffic stop outside of the time necessary to investigate the reasons for the traffic stop. *Rodriguez* 575 U.S. at 354. The Fourth Amendment, however, is not so rigid as to prohibit other inquires apart from those directly related to the "seizure's mission." *Rodriguez* clarified that inquiries made in furtherance of officer safety "remain lawful" when such "inquires do not measurably extend the duration of the stop.'" *Id*. *Rodriguez* further recognized that "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely," as traffic stops can be "especially fraught with danger to police officers." *Id.*

Because of the heightened danger involved in traffic stops, it is well established that officers may lawfully order a driver out of his or her vehicle to protect officer safety. *See Arizona*

*v. Johnson*, 555 U.S. 323, 325 (2009) (When "a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment"). Actions taken to promote officer safety, such as ordering the occupants out of a vehicle, need not be predicated on independent reasonable suspicion of danger. *Id.* The Supreme Court explained that the government's 'legitimate and weighty' interest in officer safety outweighs the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle." *Id.*

During a traffic stop, officers may seize contraband in plain view if the officers did not (1) violate the Fourth Amendment in arriving at the place from which the contraband was viewed, (2) the object's incriminating character is immediately apparent; and (3) the officer has a lawful right of access to the object seized. Simply viewing an item in plain view is not a search. But, in the context of vehicle searches, when a government actor seeks to "obtain[] information by physically intruding" on private property, a search under the Fourth Amendment has occurred. *See Florida v. Jardines*, 569 U.S. 1, 5 (2013) (quoting *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012)).

I.    **Officers Did Not Prolong the Traffic Stop When Officers Had the Defendant Exit the Vehicle and Conversed for 40 seconds at the Rear of the Vehicle**

The Defendant argues that Officer Onoja extended the purpose of the traffic stop once he asked the Defendant to step out of the vehicle to inform him of the reason for the stop and the result of their investigation up to that point. This argument is without legal merit.

A stop for a traffic violation may last as long as it takes to complete the stop's "mission." *See Rodriguez*, 575 U.S. at 354 (citation omitted). That mission includes determining "whether to issue a traffic ticket" but also "ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (citation modified).

Investigation into activity unrelated to the underlying traffic violation does not render the stop unconstitutional unless it prolongs the stop. *See id.* at 354–55; *see also United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017); *United States v. Hunter*, 663 F.3d 1136, 1144 (10th Cir. 2011).

Once Officer Onoja received the Defendant's license at 22:15:39 hours, he diligently pursued his traffic-related tasks. *United States v. Darwah*, 2026 WL 145612 at *8 (D.D.C. Jan. 20, 2026). Reasonable diligence depends on the totality of circumstances, but at minimum requires the least intrusive means available. *Id. (*quoting *Hill*, 852 F.3d at 381)). However, it does not require that an officer "move at top speed or as fast as possible." *Id.*  Here, the totality of circumstances showed that officers acted with reasonable diligence. Officer Onoja received the Defendant's license at 22:15:39 hours and the Defendant's registration twenty seconds later at 22:15:57 hours. He began walking back to his police cruiser to check the Defendant's information about twenty seconds later at 22:16:10 hours. During the check, he observed a notation in the records that left him uncertain, but with the assistance of Officer Thrift, determined that the notation meant that the Defendant was on probation or supervised release. In total, he completed the check in three minutes. In short, there is no basis for finding that officers performed their duties "in a deliberately slow or inefficient manner to expand the criminal investigation within the temporal confines of the stop." *United States v. Blackson,* 2026 WL 64429 at *6 (D.D.C. Jan. 8, 2026).

The stop was not rendered invalid because officers questioned the Defendant and shined their flashlights into the car during the three minutes that Officer Onoja was checking the Defendant's license. The officers were permitted to conduct non-traffic inquiries during the traffic stop, and nothing they did prolonged the stop. *Rodriguez*, 575 U.S. at 355; *Darwah*, at *7.

Once the check was finished, to complete the traffic stop, Officer Onoja wanted to communicate the basis for the stop and the result of the investigation. Based on the information

learned by officers that the Defendant was on probation for armed robbery, and to avoid having a conversation while exposed to passing traffic, he elected to do this with the Defendant outside of the vehicle.

Approaching a stopped car is one of the more perilous duties imposed on law enforcement officers. *United States v. Holmes*, 385 F.3d 786, 791 D.C. Cir. 2004. "Is the driver drunk? High? Armed? Are there any passengers? Has anyone in the car committed a violent crime? Do they intend to? What, if anything, are they hiding? And what will they do to keep it hidden?" *United States v. Williams*, 153 F.4th 55, 58 (D.C. Cir. 2025); *See Barnes v. Felix*, 605 U.S. 73 (2025) (Kavanaugh, J., concurring). That is why a significant percentage of murders of police officers occur when officers are making traffic stops. *Id.; Statistics on Law Enforcement Officer Deaths in the Line of Duty from January through August 2024,* FBI, https://perma.cc/XS86-6DH2. In recognition of this, it is well-established that once a motor vehicle has been lawfully detained, the officers may order the driver to get out of the vehicle without violating the Fourth Amendment. *Mimms*, 434 U.S. at 110-111. Officers may do so without any "cause to believe any occupant of the vehicle is involved in criminal activity." *See Johnson*, 555 U.S. at 326.

Once ordered to exit the vehicle, the Defendant got out his vehicle at 22:20:16 hours. Sergeant Kelly's command to secure the Defendant was issued forty seconds later at 22:20:55 hours. (BWC, Officer Sholoye, 22:20:16 – 22:20:55). During these forty seconds, Officer Onoja was simply going over the stop and what the officers had found pursuant to the traffic stop's "mission;" there was no investigative detour or safety precaution to facilitate such a detour. *Darwah*, at *7 (quoting *Rodriguez*, 575 U.S. at 355). There was no separate request for a K-9, nor was there any investigation into items in the vehicle that may have had firearms. *See Blackson*, at *5 (traffic stop prolonged by 17 minutes engaged in a firearms investigation into a backpack.). The

12

interaction with Officer Onoja was merely a short coda to the traffic stop's mission, conducted in a manner intended to preserve officers' safety. The stop was not impermissibly prolonged. Consequently, the Court should reject the Defendant's arguments to the contrary.

**II.    Sergeant Kelly Did Not Violate the Plain View Doctrine by Trespassing Into the Vehicle to Look Into the Driver's Compartment**

The Defendant argues, under the plain view doctrine, that Sergeant Kelly violated the Fourth Amendment in arriving at the place from which he viewed the contraband in the driver's side door[1]. First, Defendant contends that Sergeant Kelly placed his flashlight "through" (ECF 16 at 15) the open window of the car and "leaned" his light (ECF 16 at 16) into the car. Second, Defendant argues that Sergeant Kelly committed a trespassory search when he touched the vehicle as he was shining the flashlight. (ECF 16 at 16). Neither argument is availing.

First, Sergeant Kelly did not trespass inside of the vehicle and thereby conduct a search. The body worn camera angles show that he stood next to the vehicle, positioned his flashlight outside the threshold of the driver's side window, and shined the light down the interior of the driver's side door. The Defendant's factual assertions are false. Simply put, Sergeant Kelly did not physically extend any part of his body or flashlight through the window. Rather, he was standing outside the vehicle, with his flashlight outside of threshold of the door shining downward, at which point he observed the contraband from a vantage point outside the vehicle in plain view. The fact that a flashlight was used does not mean that an object was not in plain view. *United States v.*

---

[1] As discussed above, the plain view doctrine states that if contraband is within plain view, an officer can seize it without a warrant provided that "(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (2) the incriminating character of the evidence immediately apparent; and (3) the officer has a lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 134 (1990); *United States v. Pettiford*, 293 F. Supp. 2d 22, 24 (D.D.C. 2003) (*citing Horton*, 496 U.S. at 136-37 (1990) (quotations and alterations omitted).

*Dunn*, 480 U.S. 294, 305 (1987). Consequently, there was no physical entry into the car constituting a trespass. *United States v. Powell*, 483 F.3d 836, 838 (D.C. Cir. 2007).

Defendant next argues that Sergeant Kelly's physical contact with the car was a trespass in violation of the Fourth Amendment, citing *United States v. Richmond,* 915 F.3d 352, 357 (5th Cir. 2019). *Richmond* held that a state trooper conducted a search when he pressed on a tire for the purpose of determining whether the tire contained contraband because there was a "trespass…conjoined with an attempt to find something or obtain information." But this District specifically ruled in *United States v. Gorham,* 2024 WL 1117776 (D.D.C. Jan. 10, 2024) (Berman Jackson, J.), that *Richmond's* holding did not apply to facts nearly identical to the case at bar.

In *Gorham*, officers examined the interiors of several parked occupied cars, viewing the interior of the Defendant's vehicle with the assistance of a flashlight. *Id.* at *2. The body worn camera showed two officers make physical contact with the car, with one officer resting his hand on the windshield while another officer "cupped his hands around his eyes, the edge of each hand pressed directly against the front passenger window while looking inside." *Id.*



*Figure 6 - Image from Gorham at *2*

14

*Gorham* closely analyzed whether this conduct constituted a trespass under *United States v. Jones*, 565 U.S. 400 (2012), noting the "great pains" the Supreme Court took to find that it was the Government's *installation* of the GPS device, *and* its use of that device, which constituted a search. *Gorham*, at \*5 (citing *Jones*, 565 U.S. at 404) (emphasis in original). *Gorham* found that the officers' touching of the window was not comparable to the pressing of the tire in *Richmond*. *Id.* at 7. "After all, it was not the touching of the vehicle in *Jones* that transformed the officers' conduct into a trespass; it was the 'installation' of a GPS device, both modifying the integrity of the vehicle and enabling the government to track the defendant's whereabouts." *Id.* Moreover, *Gorham* found that the touching in *Richmond* was a means to acquire information that was otherwise inaccessible – divining whether there was something in the tires. *Id.* By contrast, in *Gorham*, the officers' touching of the windows "was merely incidental" to using the flashlight to see inside the car." *Id.* Consequently, the court ruled that the touching in *Gorham* was not a trespassory search under the Fourth Amendment. *See United States v. Fellmy*, 165 F.4th 501, 508 (6th Cir. 2026) (holding that a drug-sniffing dog did not improperly search a car when it touched it while conducting a sniff; in so doing, it suggested that officers would not violate the Fourth Amendment if they touched a car while looking into it); *see also United States v. Head,* 783 F.2d 1422, 1427 (9th Cir. 1986) (concluding, pre-*Jones*, that deputies' physical touching of a car's exterior had not constituted a search); *United States v. Macias,* No. 18-CR-137, 2018 WL 6600271 (E.D. Wis. Dec. 17, 2018) (finding no search where officer "cupped his hands, making contact with the window while peering inside"). The Court should therefore follow *Gorham's* holding and reject Defendant's assertion that the contact with the vehicle was a trespassory search in violation of the Fourth Amendment.

### III.    Once Contraband Was Found in the Driver's Side Door, Officers Had Probable Cause to Search the Remainder of the Vehicle and its Compartments

Once officers found the narcotics in the Defendant's car door panel, the officers then had probable cause to conduct a search of the vehicle and any containers therein. *California v. Acevedo*, 500 U.S. 565 (1991). "The scope of a warrantless search based on probable cause is no narrower – and no broader – than the scope of a search authorized by a warrant supported by probable cause." *United States v. Ross*, 456 U.S. 798, 823 (1982). "Where police officers have probable cause to search an entire vehicle, they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages, that may conceal the object of the search." *Id.* Consequently, the ensuing search of the center console of the vehicle, yielding the firearm, digital scale, and Ziplock bags, and the backpack in the backseat, which yielded the 2.5 pounds of suspected cocaine, were also lawful. Therefore, the Defendant's motion to suppress tangible evidence should be denied.

**CONCLUSION**

Based on the facts and submitted arguments above, the Defendant's motion should be denied. First, officers did not unlawfully prolong the stop by ordering the Defendant to step out of the vehicle and briefly speaking with him at the rear of the vehicle. Second, officers did not conduct a trespass under the Fourth Amendment when viewing the driver's compartment from outside of the vehicle with the aid of a flashlight. They remained outside of the vehicle when viewing the interior. Their touching the exterior of the vehicle is not a trespassory search in this jurisdiction. The Government respectfully requests that this Court deny the Defendant's motion to suppress on the pleadings.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY


By:     _s/ Travis Wolf_____
        Travis Wolf
        Lauren Ibanez
        Assistant United States Attorneys
        NY Bar No: 5483243 (Wolf)
        NJ Bar No: 261642019 (Ibanez)
        United States Attorney's Office
        601 D Street, NW
        Washington, D.C. 20530
        202-803-1670 (Wolf)
        703-388-6179 (Ibanez)
        Travis.Wolf@usdoj.gov
        Lauren.Ibanez@usdoj.gov

17